Filed 5/27/26  Fund Recovery Services v. Keesal, Young & Logan CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FUND RECOVERY SERVICES, LLC,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>KEESAL, YOUNG & LOGAN et al.,<br><br>　　　Defendants and Respondents. | B339325<br><br>(Los Angeles County Super. Ct. No. 20STCV43704) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

　　　Dempsey Law, Michael D. Dempsey and Rebecca A. Asuan-O'Brien, for Plaintiff and Appellant.

　　　Keesal, Young & Logan and Michael M. Gless, for Defendants and Respondents.

_____

Fund Recovery Services LLC (Fund Recovery) appeals from a judgment following a grant of summary judgment in favor of law firm Keesal, Young & Logan (KYL) and KYL partner Sandor X. Mayuga (collectively, Defendants), after the trial court determined Fund Recovery's fraud claim was barred by the statute of limitations. The fraud claim is based on Defendants' representation of Shoreside SPV Funding I, LLC (Shoreside I) and Shoreside Loans, LLC (Shoreside Loans, collectively, the Shoreside Entities) in several transactions. In the first transaction, Fund Recovery's assignor, lender Princeton Alternative Income Fund LP (Princeton), loaned money to Shoreside I.[1] Fund Recovery contends that Defendants then helped craft a second transaction to divert all of Shoreside I's assets to a new entity created with an unwitting third party. Fund Recovery alleged the new entity was created to allow the Shoreside Entities to discontinue their operations and evade their obligations to Fund Recovery, while continuing their operations under a new name.

In 2016 Fund Recovery sued the Shoreside Entities and others (but not Defendants) in federal court. (See *Fund Recovery Services LLC et al. v. Shoreside SPV Funding I, LLC et al.* (C.D.Cal., 2:16-cv-06954-SJO-JC.) In November 2020 Fund Recovery sued Defendants in this action, claiming Defendants actively participated in the fraud rather than acted as "mere scriveners." Fund Recovery contends the two transactions were

---

[1] Princeton assigned its rights and interests in the loans to Fund Recovery in September 2016. Although Princeton was a co-plaintiff along with Fund Recovery in the instant suit, the trial court dismissed Princeton for lack of standing, and Princeton is not a party to the appeal.

used in tandem to defraud Fund Recovery as well as the third party.  Fund Recovery alleged it did not discover the extent of Defendants' involvement in the fraudulent scheme until a November 16, 2017 meeting with the principal of the third party, three days before the statute of limitations would have expired.

Defendants moved for summary judgment, arguing the action was barred by the three-year statute of limitations for fraud.  They introduced evidence that, in June 2017 during the federal action, Fund Recovery questioned Mayuga during his deposition about an email to the third party that, according to Fund Recovery's complaint and admissions in discovery, demonstrated Defendants' active involvement in the allegedly fraudulent transaction.  Defendants argued the email placed Fund Recovery on inquiry notice of its fraud claim before November 2017.  The trial court agreed and granted summary judgment.  Because there was no triable issue of material fact regarding Fund Recovery's inquiry notice, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Alleged Fraud and Fund Recovery's Complaint*
According to Fund Recovery's operative amended complaint, Defendants knowingly facilitated a scheme comprised of two deals that, together, defrauded Princeton.  Mayuga and KYL represented the Shoreside Entities during the relevant transactions.  The first deal was between Princeton and the Shoreside Entities, and the second deal was between the Shoreside Entities and a third party, FPH Capital Partners LLC (FPH), which was also a victim of the fraudulent scheme.

In the first deal, Princeton entered into a Loan and Security Agreement (Loan Agreement) that provided a line of

3

credit to Shoreside I and granted Princeton a security interest in Shoreside I's assets (the Loan Deal). The Agreement included provisions prohibiting the transfer of Shoreside I assets. Shoreside Loans executed a separate agreement with Princeton to guarantee Shoreside I's obligations to Princeton. Defendants and the Shoreside Entitles included terms and promises in the agreements they knew to be false, including that Shoreside I was "[s]olvent and will continue to be solvent" and that Shoreside Loans would remain in business and would not transfer its assets. Mayuga knew Shoreside Loans lacked sufficient assets to remain solvent but nonetheless misrepresented the company's financial condition to induce Princeton to enter the Loan Deal. Defendants also knew the Shoreside Entities would not comply with the agreements, including the obligation to repay the credit line, and later helped them evade those obligations through a second deal.

In the second deal (the Asset Transfer Deal), Defendants assisted in transferring the loan collateral from Shoreside I to a newly formed entity, Shoreside Capital, LLC (the New Entity). To carry out the transaction, the Shoreside Entities and Defendants recruited third party FPH, which the complaint alleged was also a victim of the scheme. The Shoreside Entities and Defendants convinced FPH to co-found and provide capital resources for the New Entity. The Shoreside Entities then discontinued their operations and moved those operations and the loan collateral to the New Entity in violation of the Loan Agreement. By transferring the loan collateral, the Shoreside Entities (as reconfigured) got an infusion of cash from FPH, but could evade their contractual obligations to Princeton. Defendants had a financial incentive to facilitate the Asset

4

Transfer Deal to generate funds to pay the Shoreline Entities' outstanding legal fees, some of which FPH ultimately paid directly to KYL. Defendants had orchestrated at least three similar fraudulent schemes.

The complaint further alleged Princeton and Fund Recovery knew Defendants participated in both transactions but did not discover until November 16, 2017 that "Defendants were not merely scriveners who prepared documents at the [o]riginal Shoreside Entities' behest," but instead "played an active and integral part" in both deals. On that date, Princeton's and Fund Recovery's officers met with Navin Narang, the managing member of FPH, at a dinner meeting. Narang described Defendants' role in initiating and structuring the Asset Transfer Deal, including Mayuga's efforts to direct negotiations and deflect questions about the Loan Deal. At that meeting, Princeton and Fund Recovery learned "the extent to which Defendants used and misused their intimate and full knowledge of the [Loan Deal] in using the [Asset Transfer Deal] to defraud [Princeton]. It was only as a result of further, more lengthy discussions with Narang regarding both deals that [Princeton and Fund Recovery] were finally able to piece together how the two deals were used together to defraud [them] and FPH and the critical component driving both deals was Defendants' involvement."

Defendants "could not ethically participate in, direct, or facilitate the transfer of those assets to another entity" because Defendants would have known that transfer violated the Loan Deal agreements. Defendants nevertheless "took numerous overt acts in furtherance of the continued fraud upon [Princeton] by drafting, reviewing, and revising documents for the [Asset

5

Transfer] Deal and were actively involved in every aspect of negotiating the [Asset Transfer] Deal."

To induce FPH to enter the Asset Transfer Deal, Defendants falsely represented that the Asset Transfer Deal would not violate the Loan Deal agreements. A June 8, 2016 email exchange between Mayuga and Narang "evidence[d] [Mayuga's] awareness of how the structuring of the [Princeton]/Shoreside Loans Deal and the [Asset Transfer Deal] was done to facilitate the fraud upon both [Princeton] and FPH." In that exchange, Narang asked Mayuga whether Shoreside Loans had violated any agreement "with respect to" the Asset Transfer Deal. Mayuga responded, "The short answer in my view is 'no,' " and stated he did not believe the "the structure of the [Asset Transfer Deal] breached" the Loan Agreement. The complaint alleged Princeton and Fund Recovery did not learn until November 16, 2017 about Defendants' active and integral part in the fraudulent scheme, including their misrepresentations that the Asset Transfer Deal was not violating the Loan Deal.

Fund Recovery filed its complaint on November 13, 2020 and amended it in June 2021, asserting a single cause of action for fraud. The complaint alleged Princeton was owed $4.14 million under the parties' agreements.

B.   *Defendants' Motion for Summary Judgment and Supporting Evidence*
   1.   *Summary judgment motion*
   In moving for summary judgment, Defendants argued Fund Recovery's sole cause of action for fraud was barred by the

6

three-year statute of limitations in Code of Civil Procedure[2] section 338, subdivision (d).  Because the complaint was filed on November 13, 2020, the claim was timely only if Fund Recovery reasonably did not discover facts supporting a cause of action for fraud until after November 13, 2017.  Although the amended complaint asserted Fund Recovery did not discover the alleged fraud until November 16, 2017, Defendants contended the undisputed evidence showed it was on inquiry notice of the alleged fraud no later than June 29, 2017, nearly six months earlier, when it learned of the June 2016 email exchange between Mayuga and Narang.  According to Defendants, "[t]he information which [Fund Recovery] deem[s] so critical to [its] 'belated' discovery in a November 16, 2017 dinner meeting actually appeared" in the June 2016 email that Fund Recovery's counsel received in a document production in May 2017 as part of the lawsuit in federal court (District Court Action), "before the statutory trigger date of November 13, 2017."  They contended the statute of limitations had therefore run.

      2.    *Defendants' supporting evidence*

         a.    *2015 and 2016 loan negotiations*

Defendants relied in part on allegations in the amended complaint, which admitted that Fund Recovery knew of "Mayuga's *extensive participation* in the negotiations, discussions and detailed review and redlining of the documents" leading up to the Loan Deal.  The amended complaint also alleged Defendants "took numerous overt acts in furtherance of the

---

[2]     Undesignated code references are to the Code of Civil Procedure.

7

continued fraud upon [Fund Recovery] by drafting, reviewing, and revising documents" for the Asset Transfer Deal.

b. *June 2016 email from Mayuga*

Defendants chiefly relied on the June 2016 email chain between Narang and Mayuga referenced in the amended complaint. On June 8, 2016, Narang emailed Mayuga, copying Narang's attorney and three other individuals, asking, "[D]id shoreside loans violate anything in [the Loan Agreement] with respect to [the Asset Transfer Deal]?" The next day, Mayuga responded, "The short answer in my view is 'no,' " and stated he did not believe "the structure of the [Asset Transfer Deal] breached" the Loan Agreement. According to the operative complaint, this was a false representation. Further, the complaint alleged the email "evidence[d] [Mayuga's] awareness of how the structuring of the [Princeton]/Shoreside Loans Deal and the [Asset Transfer Deal] was done to facilitate the fraud upon both [Princeton] and FPH."

Philip Burgess, a consultant to Fund Recovery and Princeton and a part owner of Princeton, testified as Fund Recovery's person most knowledgeable. At his deposition, when asked to identify the "multiple false representations regarding the [Asset Transfer Deal]" that Fund Recovery alleged Defendants had made, Burgess pointed only to the "multiple misrepresentations" in the June 9, 2016 email from Mayuga.

c. *Discovery in the District Court Action regarding the June 6, 2016 email*

In October 2016 Fund Recovery sued the Shoreside Entities, Narang, and FPH for fraud and conversion in the District Court Action. (*Fund Recovery Services LLC v. Shoreside SPV Funding, I, LLC et al.*, *supra*, No. 2:16-cv-06954.) Mayuga

8

and KYL were not parties to that case. In April 2017 Narang and Fund Recovery met to discuss the Shoreside Entities' fraud. At that meeting, Fund Recovery agreed to dismiss Narang and FPH from the District Court Action.

The same month, Fund Recovery served a subpoena on KYL. KYL responded in May 2017. The document production included a copy of the June 2016 email chain between Mayuga and Narang.

On June 29, 2017, Fund Recovery deposed Mayuga as a witness in the District Court Action. During the deposition, Fund Recovery's counsel marked the June 2016 email chain as an exhibit and questioned Mayuga about whether his email response was true or whether it was a misrepresentation. Mayuga testified he recalled receiving the email and responding to it.

d.     *November 16, 2017 dinner meeting*

Defendants also introduced evidence concerning the November 16, 2017 meeting attended by Narang along with three Fund Recovery representatives, including Jack Cook and Burgess. In a declaration, Narang recounted that during the meeting, he "told [Fund Recovery] about Mayuga and KYL's involvement, including the assurances Mayuga provided throughout the negotiations regarding the [Loan Agreement] and his insistence that the [Asset Transfer Deal] with FPH was not in violation of the [Loan Agreement]." He stated Fund Recovery was "surprised to learn for the first time the extent of Mayuga and KYL's involvement in driving the scheme to not only defraud Princeton and get KYL invoices paid, but the extent to which Mayuga personally misled FPH."

C.      *Fund Recovery's Opposition and Supporting Evidence*

        1.      *Fund Recovery's opposition to Defendants' motion*

        Fund Recovery argued the actual date of discovery of Defendants' participation in the fraud is a material disputed fact, with Fund Recovery maintaining it did not learn the "extent and nature of Defendants' fraudulent acts" until November 16, 2017. Fund Recovery asserted Defendants "trie[d] to equate [its] awareness of Defendants' involvement as transactional attorneys with awareness that Defendants were carrying out a fraudulent scheme.  These are two entirely different things."

        Fund Recovery argued it was aware of Defendants' involvement in the Loan Deal "but *unaware* that they used their unique knowledge of that deal to facilitate a subsequent fraudulent deal as part of an ongoing fraudulent scheme.  By virtue of what was learned at the November 16, 2017 dinner, [Fund Recovery] now knows that in addition to the [Loan Deal], Defendants orchestrated at least three additional fraudulent deals involving the transfer of assets posted as secured collateral from one entity to another."

        Fund Recovery did "not dispute production of the [June 2016] email string, receipt of the email string, or awareness of its contents."  However, Fund Recovery maintained its fraud claim did not rest on a single email, stating "The June 8-9, 2016 email string is simply evidence of one instance in which Mayuga represented to FPH that its deal with the [Shoreside Entities] did not violate the [Loan Deal]."

        2.      *Fund Recovery's supporting evidence*

        Fund Recovery's evidence focused largely on the November 16, 2017 meeting, which it claimed was when it first learned of Defendants' knowing participation in the fraud.

In a declaration, Cook (an executive affiliated with both Princeton and Fund Recovery) stated, "I did not learn until a November 16, 2017, dinner meeting in Princeton, New Jersey, that was attended by Philip Burgess ... and Navin Narang … of FPH, that [Defendants] participated in and aided and abetted the … fraud, and that there was a growing list of victims of the [Shoreside Entities' owners'] fraud. That was the first I knew of Mayuga's active involvement."[3]

Narang declared that Mayuga and the Shoreside Entities prevented his team from communicating with Princeton and that "Mayuga insisted he had the documents related to the [Loan Deal] and was familiar with the deal terms." Mayuga falsely represented in his June 2016 email that the Asset Transfer Deal

---

[3] Fund Recovery also submitted a declaration from Burgess, in which he stated "Princeton, [Fund Recovery] and I" did not learn of "the extensive fraud and aiding and abetting of Defendants in the [Shoreside Entities' owners'] wrongdoing … until November 16, 2017." The court sustained objections to Burgess's declaration.

Fund Recovery contends the court failed to comply with section 437c, subdivision (g), because it did not explain its evidentiary rulings. That statute requires the court to state the reasons for granting summary judgment and to refer to the evidence showing no triable issue exists. But Fund Recovery cites no authority requiring the court to separately explain each evidentiary ruling. More importantly, Fund Recovery does not explain why any of the rulings were incorrect. Fund Recovery's arguments regarding the propriety of the court's evidentiary rulings are therefore forfeited. (See *LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Assn.* (2023) 94 Cal.App.5th 1050, 1070 ["where, as here, the appellants' opening brief makes contentions unsupported by proper record citations or cogent legal arguments, we may treat the contentions as forfeited"].)

did not violate the Loan Agreement.  Narang stated that absent Mayuga's repeated assurances that the Asset Transfer Deal did not violate the Loan Agreement, his company would have withdrawn from the transaction.

Narang stated that at the November 16, 2017 dinner, "as we were discussing the [Shoreside Entities' owners'] fraudulent conduct, the [Fund Recovery] team asked out loud how the [owners] were able to pull off one fraudulent scheme after another.  I told them about Mayuga and KYL's involvement, including the assurances Mayuga provided throughout the negotiations regarding the [Loan Agreement] and his insistence that the [Asset Transfer Deal] deal with FPH was not in violation of the [Loan Agreement].  They were surprised to learn for the first time the extent of Mayuga and KYL's involvement in driving the scheme to not only defraud Princeton and get KYL invoices paid, but the extent to which Mayuga personally misled FPH."[4]

D.    *The Summary Judgment Ruling*[5]

In April 2024 the court granted Defendants' motion for summary judgment, concluding Fund Recovery's sole cause of

---

[4]    Fund Recovery also relied on a declaration executed by Christopher Leyva in February 2017 in the District Court Action. Leyva was the chief executive officer of a company that provided loan-management software to the Shoreside Entities.  He described transferring loan information from the Shoreside Entities to a new account for the New Entity.  The court sustained Defendants' objection to Leyva's declaration on relevance grounds.

[5]    Fund Recovery contends the trial court failed to comply with section 437c, subdivision (g), which requires a court

12

action for fraud was barred by the three-year statute of limitations.  The court concluded Fund Recovery failed to raise a triable issue of material fact regarding whether Fund Recovery was on inquiry notice of any alleged fraud no later than June 29, 2017, the date its counsel deposed Mayuga in the District Court Action.  The court found the June 2016 email chain, which was discussed during that deposition, contained "critical representations" showing Mayuga's involvement and thus put

---

granting summary judgment to "specify the reasons for its determination" by written or oral order, and to have any oral determination recorded by a court reporter.  Although there was no court reporter present to record the court's oral ruling, the parties later submitted a settled statement containing the trial court's reasoning.  Thus, Fund Recovery has not shown prejudice from the court's failure to comply with section 437c, subdivision (g).  (See Cal. Const., art. VI, § 13 [an appellant has the burden not only to show error but prejudice from that error]; *Jackson v. Lara* (2024) 100 Cal.App.5th 337, 342, fn. 2 [trial court's failure to state its reasons for granting summary judgment was harmless error and did not require reversal where appellate court's independent review established validity of the judgment]; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1146 ["reversal for a failure to state reasons is not required if the failure was harmless 'since " '[i]t is the validity of the ruling which is reviewable and not the reasons therefore' " ' "].)

Fund Recovery also argues that during the process of approving the Settled Statement, the trial court "forced" Fund Recovery to "include verbatim language" from Defendants' proposed amendments to Fund Recovery's Proposed Settled Statement which "does not accurately reflect the proceedings."  But Fund Recovery identifies no specific inaccuracy and explains no resulting prejudice.

Fund Recovery on notice before the November 16, 2017 meeting. The court further ruled that the knowledge of Fund Recovery's attorneys was imputed to Fund Recovery. Because the action was filed three years and six months after the June 29, 2017 deposition, and because the statue for limitations for fraud is three years, the court held the claim was time-barred.

Fund Recovery timely appealed.[6]

---

[6] The trial court initially issued a minute order and a signed order granting Defendants' motion for summary judgment, but refused to sign a judgment, stating "The Court finds the Plaintiff's [*sic*] Motion for Summary Judgment was GRANTED and the First Amended Complaint was DISMISSED with prejudice on 4/18/24. Since the case was dismissed, there is no need for a Judgment." However, "[a]n order granting summary judgment is not an appealable order." (*Champlin/GEI Wind Holdings, LLC v. Avery* (2023) 92 Cal.App.5th 218, 223.) Instead, "an appeal can only be taken from [the subsequent] entry of judgment." (*Blauser v. Dubin* (2024) 106 Cal.App.5th 918, 922.) We ordered the trial court to sign an appealable judgment, which it did while this appeal was pending. Accordingly, we construe Fund Recovery's notice of appeal as taken from the later entered judgment. (See Cal. Rules of Court, rule 8.104(d)(2) ["The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment."]; *Rozanova v. Uribe* (2021) 68 Cal.App.5th 392, 398, fn. 3 [construing a notice of appeal from a nonappealable order to apply to subsequent signed appealable order].)

## DISCUSSION

A.  *Applicable Law and Standard of Review*

    1.    *Summary judgment and the statute of limitations*

We review a summary judgment ruling de novo.  (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.)  In so doing, we " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' "  (*Ibid.*)  "Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' "  (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; see § 437c, subds. (c) & (f).)

"The statute of limitations operates in an action as an affirmative defense."  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 396; see *Gutierrez v. Tostado* (2025) 18 Cal.5th 222, 231.)  In moving for summary judgment on the statute of limitations affirmative defense, once a defendant establishes all the elements of the defense, the burden shifts to the plaintiff to show one or more triable issues of material fact.  (§ 437c, subd. (p)(2); *Casarez v. Irigoyen Farms, Inc.* (2025) 114 Cal.App.5th 873, 881; *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484-1485.)  " 'The plaintiff ... shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto.' "  (*Casarez*, at p. 881; see § 437c, subd. (p)(2).)

    2.    *Delayed discovery*

Section 338, subdivision (d), provides that "the cause of action [on the ground of fraud or mistake] is not deemed to have accrued until the discovery, by the aggrieved party, of the facts

constituting the fraud or mistake." "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period."[7] (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*); see *MGA Entertainment, Inc. v. Mattel, Inc.* (2019) 41 Cal.App.5th 554, 561 (*MGA*).) Under this test, "we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Fox*, at p. 807.) In ascertaining when a plaintiff has reason to suspect a factual basis for the "elements of a cause of action, courts 'do not take a hypertechnical approach. ... Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.' " (*Choi v. Sagemark Consulting* (2017) 18 Cal.App.5th 308, 323.)

"[I]n order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable

---

[7] " ' "The elements of fraud ... are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 32; accord, *Alves v. Weber* (2025) 111 Cal.App.5th 99, 112; see also Civ. Code, §§ 1709, 1710 [statutory definition of deceit].)

16

investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Fox, supra,* 35 Cal.4th at pp. 808-809.)

" '[I]f an action is brought more than three years after commission of the fraud, plaintiff has the burden of pleading and proving that he did not make the discovery until within three years prior to the filing of his complaint." (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1472; see also *Fox, supra,* 35 Cal.4th at p. 809.) Specifically, the plaintiff " 'must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' " (*Fox*, at p. 808.)

The issue of "[w]hen a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence ... can support only one reasonable conclusion." (*Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 193; accord, *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112; *People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.* (2023) 94 Cal.App.5th 521, 552; *Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 64.)

17

B.    *Defendants Met Their Initial Burden To Show Fund Recovery's Claim Was Time-barred*

The statute of limitations for fraud is three years.  (§ 338, subd. (d).)  Fund Recovery's amended complaint alleged the claim did not accrue until the November 2017 dinner meeting with Narang.  Although it previously knew Defendants were involved in the Loan Deal and the Asset Transfer Deal, Fund Recovery claimed it did not discover until November 16, 2017 that Defendants "played an active and integral part" in the fraud.  If the undisputed evidence showed that before November 13, 2017 Fund Recovery "ha[d] reason to at least suspect" it had been injured by some kind of wrongdoing by the Defendants, summary judgment was proper.  (*Fox*, *supra*, 35 Cal.4th at p. 803.)

Defendants established that Fund Recovery was on inquiry notice of Defendants' purported fraudulent scheme by June 2017 at the latest.  Fund Recovery's amended complaint alleged Mayuga's June 2016 email to FPH "evidence[d] his awareness of how the structuring of the [Princeton]/Shoreside Loans Deal and the [Asset Transfer Deal] was done to facilitate the fraud upon both [Princeton] and FPH."  Its person most knowledgeable, Burgess, testified this email contained the misrepresentations by Defendants that were central to Fund Recovery's fraud claim.

Specifically, in the June 2016 email thread, Mayuga represented that the Asset Transfer Deal would not violate the Loan Deal agreements to induce FPH to enter the deal.  However, according to Fund Recovery, Mayuga knew that was false, because he represented the Shoreside Entities in the Loan Deal.  He therefore knew the Loan Deal agreements required the entities to remain solvent and not transfer their assets.  If the Shoreside Entities' assets were moved to the New Entity, those

18

promises could not be performed. Accordingly, based on Fund Recovery's theory of the alleged fraud, Defendants "could not ethically participate in, direct, or facilitate the transfer of those assets to another entity" because Defendants would have known that transfer violated the Loan Deal agreements. But the amended complaint contended Defendants did just that. The complaint alleged Defendants had "intimate and full knowledge" of the details of the Loan Deal, which prohibited the transfer of assets, but told FPH that such a transfer would *not* violate the Loan Agreement. Therefore, Mayuga had to have known his representation was false. According to Fund Recovery's pleading, the email reflected Mayuga's active participation in the fraudulent scheme, beyond mere ministerial document drafting.

Defendants also proffered evidence that Fund Recovery possessed that email before November 2017. KYL produced the June 2016 email chain in response to a subpoena in May 2017 during the District Court Action. The following month, Fund Recovery deposed Mayuga, marked the email as an exhibit, and questioned him about it, including questions about whether his representations in the email were accurate. At that point, Fund Recovery was at least on inquiry notice (even if it lacked actual notice) of the facts revealed in the email. (*J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 31 [" 'Under general agency principles, "an attorney is his client's agent, and ... the agent's knowledge is imputed to the principal even where ... the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact." ' "]; *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1319 [in the context of the delayed discovery rule, "it has long

been the rule in California that 'notice to an agent is notice to the principal' "].)

Defendants therefore offered evidence that by June 2017 at the latest, Fund Recovery knew or had reason to suspect Defendants' knowledge of and active involvement in the alleged fraud. (See *Hacker v. Homeward Residential, Inc.* (2018) 26 Cal.App.5th 270, 282 ["[a]n action for fraud ... accrues when a plaintiff first learns that a fraud may have occurred, so long as he or she could have confirmed the fraud through further investigation."].)

C.    *Fund Recovery Failed To Establish a Triable Issue that It Discovered Defendants' Fraud After November 13, 2017*

The trial court correctly concluded Fund Recovery failed to proffer evidence to raise a triable issue whether it had inquiry notice of Defendants' fraud prior to the normal expiration of the statute of limitations.

Fund Recovery concedes that before the November 16, 2017 dinner, it was aware of Defendants' involvement, but contends it was "unaware that they used their unique knowledge of the deal to orchestrate a subsequent deal as part of an ongoing fraudulent scheme." Fund Recovery relies on declarations from Cook and Narang to argue it did not discover the extent of Defendants' role in the fraud until the November 16, 2017 meeting when Narang provided this information to Cook and others. Narang's declaration recounted that at the November 2017 dinner, those present discussed "Mayuga and KYL's involvement, including the assurances Mayuga provided throughout the negotiations regarding the [Loan Agreement] and his insistence that the [Asset Transfer Deal] deal with FPH was not in violation of the [Loan Agreement]." In substance, Narang relayed what the June

20

2016 email showed:  Defendants were involved in the Asset Transfer Deal and, to induce Mayuga to enter the deal, represented to Narang that it did not violate the Loan Agreement.  Fund Recovery identifies no new fact learned in November 2017 that was not apparent from the June 2016 email.  As explained, by June 2017, Fund Recovery was on inquiry notice when it deposed Mayuga and examined the June 2016 email.  That is so even if specific individuals affiliated with Fund Recovery, such as Cook, did not personally understand the significance of the information in the June 2016 email at the time.

Arguably, Mayuga's June 2016 email does nothing more than deny that the Asset Transfer Deal violated the Loan Deal— a representation to a third party (Narang), not to Fund Recovery.  Considered on its own, we agree with Fund Recovery that the email does not appear to be a "smoking gun" demonstrating Defendants perpetrated fraud on *Fund Recovery*.  However, as discussed, Fund Recovery's complaint alleged the email "evidence[d] [Mayuga's] awareness of how the structuring of the [Princeton]/Shoreside Loans Deal and the [Asset Transfer Deal] was done to facilitate the fraud upon both [Princeton] and FPH."  As Fund Recovery argued in its opposition to the motion for summary judgment, its fraud claim in large part relies on the theory that Defendants' misrepresentations to *Narang and FPH* were part of the "ongoing fraudulent scheme" targeting both FPH and Fund Recovery as victims.  Thus. under Fund Recovery's theory, Mayuga's misrepresentations to Narang about the Loan Deal were integral to Defendants' fraudulent scheme.  Having alleged the email demonstrated Defendants' awareness and participation—the crux of the claimed fraud—Fund Recovery

cannot now contend the same email did not reveal misconduct. (See *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 456 ["A defendant may rely on judicial admissions in moving for summary judgment."]; *Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324 [" 'A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions of the truth of a matter and have the effect of removing it from the issues.' "].)

Fund Recovery also argues that the June 2016 email did not "capture or disclose the complexity of KYL's fraudulent scheme." It asserts the amended complaint alleged several misrepresentations beyond those in that email. But it identifies none. Moreover, even if Fund Recovery did not understand the full "complexity" of the alleged scheme until the November 2017 dinner, that did not delay accrual of the cause of action. The question is not whether Fund Recovery understood the entire scheme when it became aware of the email string, but when it had reason to suspect wrongdoing.[8] (See *MGA, supra*, 41 Cal.App.5th at p. 564 ["the question is not when [the plaintiff]

---

[8] For the same reason, Fund Recovery did not raise a triable issue that the cause of action was delayed until Fund Recovery learned at the November 2017 dinner that " 'there have been at least three (3) additional fraudulent schemes involving the knowing and intentional transfer of assets posted as secured collateral from one entity to another for the purpose of avoiding obligations owed to unsuspecting victims such as [Princeton] and [Fund Recovery].' " Discovering there were other alleged schemes may have strengthened Fund Recovery's suspicions or provided additional context, but it did not restart or delay the statute of limitations.

22

actually discovered [the] misappropriations; it is when [the plaintiff] by the exercise of reasonable diligence should have discovered [the defendants] engaged in misappropriation"].) Undisputed facts demonstrate that by June 2017 at the latest, Fund Recovery was on notice of Defendants' role in the Asset Transfer Deal—conduct the amended complaint describes as a "continu[ation]" of the original fraud. (See *id.* at p. 563 [a party may not "compartmentaliz[e] its suspicion of wrongdoing"]; *Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 179 ["because a party "was always aware of the general role of Respondents," he "could not wait for any admission by them of fault, to form at least 'a suspicion of wrongdoing' when it all went bad"].)

Finally, Fund Recovery argues it did not discover the fraud earlier because Defendants actively concealed their conduct. Fraudulent concealment can toll a limitations period while a claim remains undiscovered, but only until the plaintiff, through reasonable diligence, should have discovered it. (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931; see *MGA*, *supra*, 41 Cal.App.5th at p. 561.) The doctrine does not apply once the plaintiff is on notice of a potential claim. (*MGA*, at p. 561.) Thus, the doctrine does not apply here.

Because the undisputed evidence showed Fund Recovery was on inquiry notice of Defendants' role in the alleged fraud no later than June 2017, the trial court properly found Fund Recovery's claim was time-barred and granted summary judgment in favor of Defendants.

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to recover their costs on appeal.[9]


                                        STONE, J.

We concur:


SEGAL, Acting P. J.


GIZA, J.[*]

---

[9] Defendants claim their costs on appeal "include all time spent drafting and finalizing the Settled Statement."  They are incorrect, in part because the fees incurred in preparing a settled statement are incurred in the trial court, not on appeal.  (See *Muller v. Reagh* (1959) 170 Cal.App.2d 151, 153 ["A proposed settled statement is not the record on appeal or any part thereof.  There is no provision in the rules for allowance of this type of item" as a recoverable cost on appeal].)

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.